**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CITY OF CHICAGO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 21 C 518 |
| v. | ) | |
| | ) | Judge Sara L. Ellis |
| EQUTE LLC, JEFFREY EVENMO, | ) | |
| and JUISHY LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**<u>OPINION AND ORDER</u>**

The City of Chicago ("the City") brought this enforcement action against Equte LLC ("Equte"), Juishy LLC ("Juishy" and, with Equte, the "Corporate Defendants") and Jeffrey Evenmo (collectively, "Defendants") for violating several sections of the Municipal Code of Chicago ("MCC") related to tobacco sales and business practices. After the Court denied Defendants' motion to dismiss, *see* Doc. 51, the parties completed fact discovery on August 31, 2022, *see* Doc. 69. Now, both Defendants [112] and the City [85] move for partial summary judgment.

Defendants raise several jurisdictional and statutory-interpretation arguments that this Court previously resolved in its decision denying their motion to dismiss, urging the Court to reconsider its rulings with the benefit of a fully-fledged factual record. Doc. 98. While declining to reexamine its initial decisions, the Court agrees that Evenmo cannot be held personally liable for any fines assessed against the Corporate Defendants in this case and enters judgment in Evenmo's favor on this issue.[1]

---

[1] Defendants also moved to exclude the City's marketing expert, Dr. Sherry Emery, under *Daubert*. The Court denies this motion.

The City argues, and Defendants concede, that the undisputed facts show that the Corporate Defendants made 600 sales of electronic cigarette ("e-cigarette") products to minors and 100 sales of flavored liquid nicotine products, constituting violations of MCC § 4-64-345 (Count Two) and MCC § 4-64-355 (Count Three), respectively. The Court enters judgment for the City on these Counts. The City further moves for summary judgment on its claim that the Corporate Defendants violated MCC § 2-25-090 (Count One) by (1) violating MCC §§ 4-64-345 and 355 and (2) using automatic age-verification systems that allowed them to make sales to Chicagoans younger than twenty-one, which the City argues constitutes an unfair business practice. Defendants concede the first theory of liability, so the Court enters judgment for the City on Count One. However, because the Court finds that the Corporate Defendants' use of automatic age-verification systems cannot as a matter of law constitute an unfair business practice, the Court denies the City's motion for summary judgment on this theory of liability.

**BACKGROUND[2]**

I. **The Parties**

A. **The Corporate Defendants**

Equte and Juishy are both Minnesota corporations with their principal places of business in Minnesota. Equte, which Evenmo created sometime between 2013 and 2014, sold e-cigarettes, vaping products, and other nicotine products on a website with the domain name vapes.com. Equte possessed its own bank accounts, filed corporate tax returns between the 2016 and 2018 tax years, and issued profit and loss statements between 2017 and 2019. Evenmo could not recall when he founded Juishy, which marketed and sold flavored liquid nicotine products on

---

[2] The Court derives the facts set forth in this section from the joint statements of fact submitted by the parties. The Court takes these facts in the light most favorable to the non-movant, depending on which cross motion the Court is addressing.

2

vapes.com and Juishy.com.  Although Juishy also operated social media pages on Facebook and Instagram, it did not generate as many sales as Equte.  Juishy never had its own bank account, owned any domain names, or employed anyone.

The Corporate Defendants used two automatic age-verification programs to monitor their sales: Subuno and AgeChecker.net ("AgeChecker").  Subuno is an e-commerce verification program that Defendants primarily used as a fraud-detection tool, but it was also capable of screening underage purchasers.  Subuno would halt orders "in which the billing address, shipping address, credit card name or email address did not seem to 'match up.'"  Doc. 87 ¶ 23 (quoting Doc. 89 at 125:18–24, 126:1–13).  AgeChecker, which the Corporate Defendants began using in March 2017, would ask customers to enter their date of birth and other personal identifying information, and could require a consumer to upload a photo ID.  The software would then cross-reference customer information against a "database of public records and credit information to verify the customer's age."  *Id.* ¶ 29.  Although AgeChecker allowed its users to customize the age limits on their websites, the Corporate Defendants initially kept the age limit at AgeChecker's default setting of eighteen years, which they believed kept them in compliance with the laws of all fifty states.  It was not until October 23, 2017, that one of the Corporate Defendants' contractors informed them that certain Minnesota localities moved the age limit for tobacco sales from eighteen years to adults over the age of twenty-one.  The contractor discussed how the Corporate Defendants could use Subuno to hold orders placed from more restrictive jurisdictions and manually cross-reference them against the age the customer entered in AgeChecker.  The record does not reveal whether the Corporate Defendants took any such step, but Evenmo, speaking as the Corporate Defendants' representative, testified that no one researched local minimum age laws in other states after learning that some cities in Minnesota

3

became more restrictive.  On June 28, 2019, AgeChecker allowed its users "to enforce age requirements down to the county, city, or zip code in the United States," *id.* ¶ 38, which the Corporate Defendants used.

On February 17, 2021, before the City served Defendants with process, Evenmo, the Corporate Defendants' sole owner and CEO, administratively terminated Juishy.  Then, on May 11, 2021, also before the City served Defendants, Equte sold its domain page vapes.com to an unrelated party.

### B.    Jeffrey Evenmo

Evenmo is a Minnesota resident and citizen.  He created his businesses because, as a former smoker, he thought e-cigarettes provided a healthier alternative to more traditional forms of smoking.  Evenmo recognized that this did not make his products healthy, however, and said that he thought young people should stay far away from his products.  Although Evenmo was the final decisionmaker for the Corporate Defendants, he did not oversee day-to-day operations at their warehouse.  Evenmo was the only person authorized to make transfers from Equte's business account and would periodically transfer funds from Equte's account to his personal checking account.  For example, in January 2017, Evenmo made eleven transfers to his personal account in the sum of $172,790.24.  The transfers were frequently strings of identical numbers, including $17,171.17, $11,111.11, $11.111.10, $9,888.88, and $8,888.88.  When asked about these transfers, Evenmo replied that he "was probably just being lazy."  Doc. 89 at 85:10–11.  Evenmo also leased two Tesla cars in Equte's name, which he did to "try the nicest one they have."  Doc. 90 at 38:4–11.  Evenmo did this despite working from home full-time and travelling to his companies' warehouse only six times per year.

4

C.      **The City's Tobacco Enforcement Regime**

Scientific evidence clearly establishes that nicotine is highly addictive, causes a heightened risk of cardiovascular defects, and hinders brain development in humans under the age of twenty-five.  To combat these potential health issues in the City's youth, the City enacted an ordinance on July 1, 2016, prohibiting the sale of tobacco products to anyone under the age of twenty-one.  MCC § 4-64-345.  While the law covers e-cigarettes and other vaping products, the City enacted it before these products exploded in popularity, especially among young people.  E-cigarettes pose a particular danger because they are more efficient at delivering nicotine into the body than traditional cigarettes, and because vendors of liquid nicotine used in e-cigarettes could make their products taste like soda, candy, popcorn, or other products that might appeal to younger individuals.  On October 7, 2020, the City enacted MCC § 4-64-355, banning flavored liquid nicotine products.

II.      **The City's Investigation**

On October 29, 2020, Adam Weller, an investigator in the City's Department of Business Affairs and Consumer Protection (the "Department"), attempted to purchase a flavored liquid nicotine product from Equte.  Equte rejected Weller's order, and an Equte employee emailed him on November 2, 2020, asking for a picture of Weller holding his ID card.  Weller emailed a photograph of himself and his driver's license on November 3, 2020, and successfully ordered a flavored liquid nicotine product on November 6, 2020.  After investigating this sale, the Department determined that the Corporate Defendants violated MCC § 2-25-090 by separately violating regulations governing business conduct, namely the regulations pertaining to the Corporate Defendants' tobacco sales.  The Department referred the case to the City's Corporation Counsel, which filed the instant enforcement action against Defendants on January

29, 2021.  After the City served Defendants on July 26, 2021 (and informed the Court of the service on August 23, 2021), the Court issued a discovery order to which neither side objected.

After the City obtained discovery, it learned from the Corporate Defendants' sales data that they had sold 600 tobacco products to Chicago residents between the ages of eighteen and twenty-one—589 from Equte and 11 from Juishy—after the City enacted MCC § 4-64-345 on July 1, 2016.  The City also identified 100 sales from the Corporate Defendants' data of flavored liquid nicotine products after it enacted MCC § 4-64-355 on October 7, 2020.  Defendants do not contest the number or characterization of the sales the City identified.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  To determine whether a genuine dispute of material fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, documents, answers to interrogatories, admissions, stipulations, and affidavits or declarations that are part of the record. Fed. R. Civ. P. 56(c)(1); *A.V. Consultants, Inc. v. Barnes*, 978 F.2d 996, 999 (7th Cir. 1992). The party seeking summary judgment bears the initial burden of demonstrating that no genuine dispute of material fact exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Bunn v. Fed. Deposit Ins. Corp. for Valley Bank Ill.*, 908 F.3d 290, 295 (7th Cir. 2018).  "A genuine issue of material fact exists when 'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'"  *Brown v. Osmundson*, 38 F.4th 545, 549 (7th Cir. 2022) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to identify specific material facts that demonstrate a genuine dispute for trial.  Fed. R. Civ. P.

56(c)(1); *Celotex*, 477 U.S. at 324; *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014). The Court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Wehrle v. Cincinnati Ins. Co.*, 719 F.3d 840, 842 (7th Cir. 2013). However, a bare contention by the non-moving party that an issue of fact exists does not create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), and the non-moving party is "only entitled to the benefit of inferences supported by admissible evidence, not those 'supported by only speculation or conjecture,'" *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (citation omitted). The same standard applies when considering cross-motions for summary judgment. *Int'l Bhd. of Elec. Workers, Local 176 v. Balmoral Racing Club, Inc.*, 293 F.3d 402, 404 (7th Cir. 2002). Therefore, when considering the City's motion for summary judgment, the Court views all evidence in the light most favorable to Defendants, and when considering Defendants' motion for summary judgment, the Court views all evidence in the light most favorable to the City. *Id.*

# ANALYSIS

## I.    Defendants' Motion for Summary Judgment

The Court first addresses Defendants' motion for summary judgment because it challenges this Court's power to hear the case. Most of Defendants' brief repeats the same jurisdictional arguments they raised in their initial motion to dismiss. Defendants argue that the Court (1) lacks subject-matter jurisdiction over the case, (2) lacks personal jurisdiction over Evenmo (and cannot hold Evenmo personally liable as the Corporate Defendants' alter ego), and (3) should dismiss the City's claims in Count Two under the statute of limitations or doctrine of laches. The Court considers these arguments in turn.

7

A.      **Subject-Matter Jurisdiction**

The Court has subject-matter jurisdiction based on the parties' diversity of citizenship if (1) the amount in controversy is greater than $75,000 and (2) the dispute is between citizens of different states. 28 U.S.C. § 1332. Because the City is a citizen of Illinois and Defendants all hale from Minnesota, this satisfies the second prong. Defendants argue, however, that a fine would be improper in this case, meaning that the City cannot meet the amount in controversy requirement. Defendants raise three main arguments that they claim prevent the Court from issuing a fine or would make a fine improper. First, Defendants argue that MCC § 2-25-090 limits the City to pursuing equitable relief.[3] Second, they claim that an unassessed fine is a contingent liability, which cannot provide the basis for the amount in controversy. Third, Defendants argue that the City should not be allowed to leverage evidence uncovered in discovery to demonstrate that their case satisfies the amount in controversy requirement.[4]

1.      **Whether the City Can Pursue a Fine Under MCC § 2-25-090**

Defendants first argue that MCC § 2-25-090 does not allow the City's Corporation Counsel to pursue an action for damages because the language of MCC § 2-25-090(f) limits the Corporation Counsel to bringing "an action for injunctive relief or such other equitable relief that

---

[3] Defendants relatedly claim that any injunctive relief the City could obtain under this section would be moot, as they have ceased doing business.

[4] Defendants also claim that the separation of powers provision in the Constitution of the State of Illinois, Ill. Const. art. II, § 1, bars this Court from assessing a fine. *See* Doc. 98 at 15. This argument, which is cabined to two brief paragraphs containing no case citations or other legal authority, is so underdeveloped and threadbare that the Court considers it waived. *See Schaefer v. Universal Scaffolding & Equip., LLC*, 839 F.3d 599, 607 (7th Cir. 2016) ("Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority."). To the extent Defendants attempt to bolster this point in their reply brief, *see* Doc. 122 at 7–8, the Court frowns upon such tactics, *see Murphy v. Vill. of Hoffman Estates*, No. 95 C 5192, 1999 WL 160305, at *2 (N.D. Ill., March 17, 1999) ("[I]t is established beyond peradventure that it is improper to sandbag one's opponent by raising new matter in reply. Providing specifics in a reply in support of a general argument in an objection counts as new matter in reply. . . . Raising an argument generally in a motion [ ] does not give a litigant license to be vague in his original submissions and provide the necessary detail in his reply.").

the commissioner deems to be appropriate." MCC § 2-25-090(f)(4). The Court considered this argument when it ruled on Defendants' motion to dismiss. *See* Doc. 51 at 4–6. The Court decided that reading MCC § 2-25-090 alongside MCC § 2-25-050(b)(15)(ii), which authorizes the Commissioner of the Department to turn over enforcement matters to the Corporation Counsel, led to the conclusion that the code authorizes the Corporation Counsel to pursue damages for violations of MCC § 2-25-090. *See also City of Chicago v. Purdue Pharma L.P.*, No. 14 C 4361, 2015 WL 2208423 at *9 (N.D. Ill. May 8, 2015). Defendants do not raise any new arguments at this stage, except to point out that they are squarely asking the Court to interpret MCC § 2-25-090. *See* Doc. 98 at 7–8. The Court sees no reason to reexamine its initial ruling that the City may pursue fines under MCC § 2-25-090, especially because this does not dispositively determine whether the Court has jurisdiction over the case. As discussed below, the City easily satisfies the amount in controversy requirement for diversity jurisdiction based solely on the admitted violations of MCC § 4-64-345 and 355.[5]

### 2. Whether Unassessed Fines Can Establish Jurisdiction

Defendants' next argument is that the City cannot rely on unassessed fines to establish the amount in controversy. Defendants label the sum the City might collect from any fine the Court would impose in this case a "contingent liability," and point to holdings from other circuits that provide that contingent liabilities cannot be used to satisfy the amount in controversy requirement for diversity jurisdiction. Doc. 98 at 8–9 (citing *United States ex rel. Simoneaux v. E.I. duPont de Nemours & Co.*, 843 F.3d 1033 (5th Cir. 2016), and *Phelps Oil & Gas, LLC v. Noble Energy Inc.*, 5 F.4th 1122 (10th Cir. 2021)).

---

[5] Because the Court declines to reverse course on its decision allowing the City to pursue damages under MCC § 2-25-090, this case is not moot.

A municipality's claim for fines under its code can satisfy the amount in controversy requirement for diversity jurisdiction. *See, e.g.*, *City of Neodesha v. BP Corp. N. Am. Inc.*, 176 F. Supp. 3d 1233, 1248 (D. Kan. 2016) (denying motion to remand based on city's enforcement of local environmental code where sum of potential fines obviously exceeded $75,000). Such fines do not constitute contingent liabilities. "A contingent liability is one that depends on a future event that may not even occur to fix either its existence or its amount." *Freeland v. Enodis Corp.*, 540 F.3d 721, 730 (7th Cir. 2008) (internal quotation marks and alterations omitted). Examples of contingent liabilities include obligations to pay a fine when "the government has initiated no proceeding to assess it," *Simoneaux*, 843 F.3d at 1039, the amount that a third party could win in a future lawsuit using offensive collateral estoppel, *Phelps Oil & Gas, LLC*, 5 F.4th at 1127, and probability-discounted liabilities that debtors assume when they take on financial obligations, *In re Xonics Photochemical, Inc.*, 841 F.2d 198, 199–200 (7th Cir. 1988). The common thread linking cases involving contingent liabilities is that they "require speculation about the possibility of future, uncertain" events to claim that there will be damages. *Phelps Oil & Gas, LLC*, 5 F.4th at 1128. Here, the City seeks fines for past conduct—there is no speculation over whether some future party will seek to levy a claim against Defendants. *Cf. id*. Therefore, Defendants' claim that the City's effort to levy fines for past conduct destroys diversity jurisdiction fails.

### 3.      Whether the City Pled a Sufficient Amount in Controversy

Finally, Defendants argue that the City "should not be allowed to use discovery to show a legally impossible amount in controversy." Doc. 98 at 9. Relying on *Macken ex rel. Macken v. Jensen*, 333 F.3d 797 (7th Cir. 2003), Defendants claim that prior to obtaining discovery, the

City did not have sufficient reason to believe that the amount in controversy exceeded $75,000; thus, the Court should dismiss the City's complaint on this basis.

To dismiss a complaint because it fails to establish the requisite amount in controversy, "[i]t must appear to a legal certainty that the claim is really for less than the jurisdictional amount." *St. Paul Mercury Indem. Co. v. Red Cab Co.,* 303 U.S. 283, 289 (1938). In its First Amended Complaint, the City alleged that "Defendants sold their products to underage Chicagoans." Doc. 17 ¶ 52. The City also alleged that "Defendants manufactured and sold flavored liquid nicotine products," and that they would deliver those products to a Chicago address. *Id.* ¶¶ 63, 65. Accordingly, the City had reason to believe that the Corporate Defendants sold products to Chicagoans that violated its municipal code *before* it obtained discovery. *Compare* Doc. 17 (First Amended Complaint filed on May 28, 2021), *with* Doc. 25 (order setting discovery schedule entered September 15, 2021). Although the City did not specifically enumerate the number of illicit products the Corporate Defendants sold, the Court cannot say that it appeared "to a legal certainty" that the City's claims did not place at least $75,000 in controversy given that the City could seek fines of up to $10,000 for each violation of MCC § 4-64-345 and $5,000 for a violation of MCC § 4-64-355. *Red Cab Co.*, 303 U.S. at 289.

Defendants' reliance on *Macken* to assert that the City failed to shoulder its relatively light burden is misplaced. *Macken* considered whether an equitable action concerning the governance of a trust satisfied the amount in controversy requirement when each beneficiary was entitled to at least $75,000 from the trust (the amount necessary to satisfy the amount in controversy), but the relief sought—an injunction—would incur significantly less cost. 333 F.3d at 799 ("But there is no dispute about the value of the assets held in trust or either child's entitlement, so that sum is no more 'in controversy' than the value of a Rolls Royce would be

relevant to a dispute about the price of new shock absorbers."). Here, the City had at least a colorable claim that the Corporate Defendants sold illicit products to Chicago residents—it did not need more than that to escape the "legal certainty that the claim is really for less than the jurisdictional amount." *Red Cab Co.*, 303 U.S. at 289.

### 4. Whether the Amount in Controversy is Satisfied

Because the Court may impose a fine for the Corporate Defendants' violations of the City's ordinances, the amount in controversy is well-above $75,000, which means this Court has diversity jurisdiction over the City's claims. 28 U.S.C. § 1332. As discussed below, the Corporate Defendants admit to 600 violations of MCC § 4-64-345 (prohibiting the sale of tobacco products to minors under the age of twenty-one), which according to MCC § 4-64-910(a) carries a minimum penalty of $2,000 per violation (or $300,000 for 600 violations), and 100 violations of MCC § 4-64-355 (prohibiting the sale of flavored liquid nicotine products), which carries a minimum penalty of $1,000 per violation (or $100,000 for 100 violations). The total of these potential minimum fines is $400,000. This sum will only increase if the Court finds Defendants liable for violating MCC § 2-25-090(a), which carries daily penalties of up to $10,000. MCC § 2-25-090(g). Because the minimum fine the municipal code authorizes, $400,000, exceeds $75,000, there is no question that the City's complaint satisfies the amount in controversy requirement. This secures the Court's subject-matter jurisdiction over this case. 28 U.S.C. § 1332.

### B. Personal Jurisdiction Over Evenmo and Alter Ego Liability

Defendants argue that the Court lacks personal jurisdiction over Evenmo because he does not fall within Illinois' long-arm statute and cannot be viewed as the Corporate Defendant's alter ego. The Court considered this jurisdictional argument in its denial of Defendants' motion to

dismiss and determined that "[t]he City has sufficiently pleaded an alter ego theory against Evenmo." Doc. 51 at 10. Although Defendants urge this Court to reconsider this ruling, "summary judgment is an inappropriate vehicle for raising a question concerning the court's personal jurisdiction." *Li Gear, Inc. v. Kerr Mach. Co.*, No. 16 C 4657, 2017 WL 432931, at *2 (N.D. Ill. Feb. 1, 2017). For the reasons stated in its decision denying Defendants' motion to dismiss, Evenmo is properly subject to this Court's jurisdiction.[6] *See* Doc. 51 at 9–10.

However, Defendants also argue that the undisputed facts would not allow a reasonable jury to conclude that Evenmo is an alter ego for the Corporate Defendants. This is an appropriate question for the Court to consider at summary judgment. Because this goes to the merits of whether Evenmo is liable for the Corporate Defendants' fines, the Court applies Minnesota law. *See Wachovia Secs., LLC v. Neuhauser*, 674 F.3d 743, 751 (7th Cir. 2012) ("Illinois applies the law of the state of incorporation for veil piercing claims.").

"Under Minnesota law, deciding whether to allow a corporate veil to be pierced requires a court to 1) analyze whether the corporation functioned as the mere instrumentality of the principals a party is attempting to reach by piercing the corporate veil, and 2) determine whether injustice or fundamental unfairness would occur if the corporate veil were left intact." *Stoebner v. Lingenfelter*, 115 F.3d 576, 579 (8th Cir. 1997). "When using the alter ego theory to pierce

---

[6] Although the Court originally stated in its initial alter ego inquiry that Minnesota law controlled, Doc. 51 at 9, the City now observes that Illinois law should apply in the jurisdictional context, citing *Old Orchard Urban Limited Partnership v. Harry Rosen, Inc.*, 389 Ill. App. 3d 58, 69 (2009) ("[A]lthough the law of the state of incorporation applies when a party seeks to substantively pierce a corporation's veil, Illinois law governs the analysis where a party uses veil piercing to establish personal jurisdiction."). Though the City's point is well-taken, the Court does not see the need to reprise its jurisdictional analysis under Illinois law, especially considering that the Minnesota inquiry is essentially the same as the Illinois one. *Compare Victoria Elevator Co. v. Meriden Grain Co.*, 283 N.W.2d 509, 512 (Minn. 1979), *with Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhamantec*, 529 F.3d 371, 379 (7th Cir. 2008) (discussing eleven factors that largely restate and reslice Minnesota's eight factors); *see also* Doc. 121 at 15 (noting that the Minnesota veil-piercing analysis "looks to substantially similar factors as those considered by Illinois courts").

the corporate veil, courts look to the reality and not form, with how the corporation operated and the individual defendant's relationship to that operation." *Hoyt Props., Inc. v. Prod. Res. Grp., LLC*, 736 N.W.2d 313, 318 (Minn. 2007) (internal quotation marks omitted). "Doing business in a corporate form in order to limit individual liability is not wrong; it is, in fact, one purpose for incorporating. But where the formalities of corporate existence are disregarded by one seeking to use it, corporate existence cannot be allowed to shield the individual from liability for damages incurred by those dealing with the corporation." *Victoria Elevator Co.*, 283 N.W.2d at 512.

The second prong of the veil-piercing test, "whether injustice or fundamental unfairness would occur if the corporate veil were left intact," decides this question in Evenmo's favor. *Lingenfelter*, 115 F.3d at 579. At bottom, this is a question of equity, meant to make whole parties cheated after "dealing with the corporation." *Victoria Elevator Co.*, 283 N.W.2d at 512. The vast majority of the cases this Court has found applying the *Victoria Elevator* test to pierce the corporate veil have dealt with parties attempting to recover a debt from a corporation, typically involving the plaintiff suing the corporation for failing to uphold their end of a contract after the corporation defaulted and the shareholder(s) drained the corporation of its assets. *See, e.g.*, *Barton v. Moore*, 558 N.W.2d 746, 749–50 (Minn. 1997) (allowing veil-piercing claim when plaintiffs alleged corporation's owners transferred loan amount to personal accounts before corporation dissolved); *W. Concord Conservation Club, Inc. v. Chilson*, 306 N.W.2d 893, 897–98 (Minn. 1981) (piercing corporate veil when defendant "personally received the proceeds" of a contract with the corporation and the corporation "is now virtually inactive"); *MacDonald v. Summit Orthopedics, Ltd.*, 681 F. Supp. 2d 1019, 1025 (D. Minn. 2010) (declining to dismiss veil-piercing allegation when plaintiff alleged that the individual defendants overpaid themselves

14

before ceasing deferred compensation plan).  This indicates to the Court that veil-piercing is meant to ensure that the injured party is able to recover the benefit of a pre-existing agreement, or prevent a shareholder from receiving the benefit of the corporate shield for willful bad acts.

An example combining both these elements is *Mallberg v. Gustafson*, No. 27 C 16-8171, 2019 WL 5693529, at *12–14 (Minn. Dist. Ct. Aug. 2, 2019), *aff'd*, 2020 WL 2643393 (Minn. Ct. App. May 26, 2020).[7]  In *Mallberg*, the court pierced the corporate veil to ensure that the plaintiff could recover unpaid wages and commissions from his former, insolvent corporate employer.  It held that the plaintiff established that "an element of injustice or fundamental unfairness [would result] if the corporate veil [was] not pierced" when the corporation paid other creditors (and not the plaintiff) despite the undisputed debt owed to the plaintiff, the corporation (directed by the owner) refused to make *any* payments to the plaintiff for work performed after a certain date, and the corporation's owner held personal animus toward the plaintiff.  *Id*. at 14.  The court found that the existence of a statute doubling liability for wage claims "impl[ied] inherent injustice" but was "insufficient in itself" to require veil-piercing.  *Id*.  In the instant case, the City's claims chiefly rest on allegations that (1) the Corporate Defendants violated Chicago's municipal code, (2) Evenmo primarily operated the Corporate Defendants, and (3) Evenmo treated the Corporate Defendants as a personal piggy bank by, among other things, leasing a Tesla for personal use and making seemingly random account transfers from the corporate accounts to his personal checking account.  But missing from these allegations is that the Corporate Defendants ever owed anything to the City of Chicago or that Evenmo acted willfully to deprive the City of something of value by leasing the Tesla or making random transfers (or taking other actions).  Thus, although the City is entitled to enforce its municipal code, it lacks

---

[7] Of course, this opinion holds no binding precedential value over this Court.  However, its application of the *Victoria Elevator* test is instructive and, in this Court's mind, persuasive.

the allegations that would lead this Court to find that injustice would result by leaving the corporate veil intact.

Bolstering this conclusion, the Court finds it instructive that in all cases employing *Victoria Elevator* where a government agency or public entity was a party, the government entity was also attempting to enforce a contract or recover funds that the corporation already owed a duty to pay to the government. *See Minn. Power v. Armco, Inc.*, 937 F.2d 1363 (8th Cir. 1991) (applying *Victoria Elevator* to pierce cost company's corporate veil to reach parent company when cost company defaulted on nearly $20 million in payments); *United States v. Bigalk*, 654 F.Supp.2d 983 (D. Minn. 2009) (applying *Victoria Elevator* to allow reverse corporate veil-piercing where corporation held title to real estate and corporation's owners were delinquent on federal tax assessments); *BBCA, Inc. v. United States*, 733 F.Supp. 73 (D. Minn. 1989) (same); *see also Igel v. Commissioner of Revenue*, 566 N.W.2d 706 (Minn. 1997) (holding corporate director personally liable for tax debt of defunct corporation). By contrast, the Court has not found a single case under Minnesota law where a court applied *Victoria Elevator* (or some other test) to pierce the corporate veil when the government entity sought to assess fines against the corporation's owner for the corporation's violations of a statute or ordinance.

Finally, the Court cannot find that it will be unjust or fundamentally unfair to not pierce the corporate veil simply because the City is unlikely to recover a significant portion (or any) of the fines the Court might assess against the Corporate Defendants without attacking Evenmo's assets. One of the purposes of incorporating a business is to escape personal financial liability when the business becomes insolvent. *See Victoria Elevator Co.*, 283 N.W.2d at 512 ("Doing business in a corporate form in order to limit individual liability is not wrong; it is, in fact, one purpose for incorporating."). Indeed, Minnesota veil-piercing doctrine considers insolvency as a

16

relatively minor element in its overall analysis. *See Ass'n of Mill & Elevator Mut. Ins. Co. v. Barzen Int'l, Inc.,* 553 N.W.2d 446, 450 (Minn. App. 1996) (noting that insolvency is frequently present when party seeks to pierce veil of corporation that has ceased operating). Rather, injustice comes into play when the person shrouded in the corporate veil causes intentional harm. *See Chilson*, 306 N.W.2d at 898 n.3 (tracing history of veil-piercing doctrine from being "generally not available, absent fraud," to requiring "evidence that the corporate entity has been operated as a constructive fraud or in an unjust manner"). The facts before the Court do not show that Evenmo ever intended such harm. One can certainly infer that he was inattentive and lackadaisical as the owner of an online tobacco business, but the Court cannot find on the record before it that Evenmo intended to sell his e-cigarette and flavored liquid nicotine products in contravention of the City's laws. Accordingly, the Court holds that "injustice or fundamental unfairness" would not occur by leaving intact the corporate veil between Evenmo and the Corporate Defendants. *Lingenfelter*, 115 F.3d at 579. There is thus no need for the Court to "analyze whether the corporation functioned as the mere instrumentality of the principals a party is attempting to reach by piercing the corporate veil." *Id.*

The Court pauses here to address the City's argument that Illinois law holds Evenmo personally liable for the Corporate Defendants' violations of the MCC. Doc. 121 at 14 (citing *Express Valet, Inc. v. City of Chicago*, 373 Ill. App. 3d 838, 850–54 (2007)). The City argues that liability attaches to Evenmo because he was "the sole owner and officer of Equte and Juishy." *Id.* But under Illinois law, "a corporate officer is individually liable for *fraudulent* acts of his own or those of the corporation in which he participates," not a corporation's torts. *Express Valet*, 373 Ill. App. 3d at 852 (emphasis added). The City has not alleged that any of Defendants committed fraud, so *Express Valet* dictates that the Court could not hold Evenmo

17

personally liable here simply because he was the Corporate Defendants' sole owner and operator. Other Illinois cases demonstrate that personal liability only attaches when "the corporate officer had personal involvement or active participation in the acts resulting in liability, not just . . . personal involvement or active participation in the management of the corporation." *People ex rel. Madigan v. Tang*, 346 Ill. App. 3d 277, 289 (2004). Here, while the City's complaint and briefs compellingly argue that Evenmo actively managed the Corporate Defendants, the City's claims fall short of alleging that he personally directed the violations of the City's municipal code. Illinois law thus does not impose liability on Evenmo.

Although the Court maintains its initial ruling that Evenmo is properly subject to its jurisdiction, it does not find that the equitable remedy should be employed here. Evenmo is thus not subject to personal liability for any fines imposed on the Corporate Defendants.

### C. Statute of Limitations or Laches

Defendants' final challenge to the City's case is that its allegations are time-barred. Defendants first argue that a three-year statute of limitations should apply to the City's claims. The Court considered this argument in its denial of Defendants' motion to dismiss and determined that the "doctrine of *nullum tempus* grants the City immunity from otherwise applicable statutes of limitations when it is asserting 'public rights.'" Doc. 51 at 11 (citing *City of Shelbyville v. Shelbyville Restorium, Inc.*, 96 Ill. 2d 457, 458–62 (1983)). The Court's application of the factors enumerated in *City of Chicago v. Latronica Asphalt*, 346 Ill. App. 3d 264, 269 (2004) ("(1) the effect of the interest on the public; (2) the obligation of the governmental entity to act on behalf of the public; and (3) the extent to which public funds must be expended"), led it to conclude that the City was entitled to immunity from any statute of

limitations that might apply. Doc. 51 at 11. Defendants' recycling of identical arguments rejected at the motion to dismiss stage does not persuade the Court that it should reverse course.

Defendants also argue that the equitable doctrine of laches should bar the City's Count Two claims. This argument borders on frivolous. "The defense of laches bars an action when the plaintiff's delay in filing the claim (1) is unreasonable and inexcusable, and (2) materially prejudices the defendant." *Smith v. Caterpillar, Inc.*, 338 F.3d 730, 733 (7th Cir. 2003). Defendants claim that the City "wait[ed] over 4.5 years to file suit" and that "[s]uch a delay was not reasonable." Doc. 98 at 20–21. Defendants do not explain how they calculate this period that they consider an unreasonable delay. Their claim is especially puzzling because immediately before Defendants assert that they are prejudiced by this four-and-a-half-year delay, they cite the City's investigator's attempt to purchase a flavored product from Eque in November 2020 (a mere three months before the City initiated this case). *Id.* at 20. A three-month period can hardly be described as a "delay," much less an "unreasonable and inexcusable" one. *Caterpillar, Inc.*, 338 F.3d at 733; *see also, e.g.*, *Hess v. Biomet, Inc.*, No. 16 C 208, 2022 WL 2314885, at *13 (N.D. Ind. June 28, 2022) (period of less than a year between discovering facts leading to claim and filing of suit not unreasonable). Accordingly, the three-month period between the City's purchase of a flavored product and the filing of its complaint does not raise the equity concerns that laches is meant to address. *See Caterpillar, Inc.*, 338 F.3d at 733 ("[L]aches serves to protect defendants from prejudice caused by stale evidence, prolonged uncertainty about legal rights and status, and unlimited exposure to liability damages.").

In sum, the Court grants in part and denies in part Defendants' motion for summary judgment. The Court finds that the MCC allows the Court to impose a fine, and that the City's

claims are not time-barred. However, the Court concludes that the City cannot hold Evenmo personally liable for the Corporate Defendants' violations of the MCC.

## II.    The City's Motion for Summary Judgment

### A.    Count Two

The City alleges in Count Two of its First Amended Complaint that the Corporate Defendants violated MCC § 4-64-345 "by selling or otherwise furnishing tobacco products and accessories for consumption to Chicago residents under 21 years of age." Doc. 17 ¶ 92. Section 4-64-345 makes it unlawful for any person to "sell, give away, barter, exchange or otherwise furnish any tobacco product . . . to any individual under 21 years of age." The parties agree that the Corporate Defendants sold 600 tobacco products and accessories to Chicago residents under the age of twenty-one. Doc. 87 ¶ 9. Moreover, the Corporate Defendants concede that they violated the ordinance. Doc. 101 at 4 ("Equte does not dispute that it innocently violated MCC § 4-64-345[.]"). Accordingly, the Court grants the City's motion for summary judgment on Count Two.[8] Fed. R. Civ. P. 56(a) (summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law").

---

[8] Defendants claim in their summary of argument section, without elaboration, that the City's investigation into their business constituted entrapment and that Defendants' violations of the City's ordinances were "innocent." *See* Doc. 101 at 3-4. First, by merely gesturing at these arguments and making no meaningful effort to support them, Defendants waive these defenses (to the extent they are cognizable). *See Schaefer*, 839 F.3d at 607. Second, entrapment under Illinois law does not apply in civil cases. *See People ex rel. Difanis v. Boston*, 92 Ill. App. 3d 962, 964 (1981) (recognizing that defense of entrapment is unavailable in a case for injunctive relief). Even if the defense did apply, it is unavailable when "the [Defendant] was pre-disposed to commit the offense and the public officer . . . merely afford[ed] to that person the opportunity . . . for committing an offense." 720 Ill. Comp. Stat. 5/7-12. Here, Defendants were in the business of selling e-cigarette and flavored nicotine products, so they were clearly "pre-disposed" to the alleged conduct. *See Roberts v. Ill. Liquor Control Comm'n*, 58 Ill. App. 2d 171, 179 (1965) ("It is well settled that where nothing more than a simple request to make an unlawful sale of an intoxicant appears, the fact that the solicitation was by a decoy, does not make the defense of entrapment available."). Third, "innocently violating" an ordinance, Doc. 101 at 4, means that the party engaged in prohibited conduct and may be held liable. *See People v. Izzo*, 195 Ill. 2d 109, 115 (2001) ("A principle deeply embedded in our system of jurisprudence is that one's ignorance of the law does not excuse unlawful conduct.").

### B.     Count Three

The City alleges in Count Three of its First Amended Complaint that the Corporate

Defendants violated MCC § 4-64-355 "by selling or otherwise furnishing flavored nicotine liquid

tobacco products for consumption to Chicago residents."  Doc. 17 ¶ 97.  Section 4-64-355(c)

makes it unlawful to "sell, give away, barter, exchange or otherwise furnish to any other person

any flavored liquid nicotine product."  The parties agree that the Corporate Defendants sold 100

flavored liquid nicotine products to Chicago residents.  Doc. 87 ¶ 11.  Moreover, the Corporate

Defendants concede that they violated the ordinance.  Doc. 101 at 4 ("Equte does not dispute that

it innocently violated MCC § . . . 4-64-345[.]").[9]  Thus, the Court grants the City's motion for

summary judgment on Count Three.  Fed. R. Civ. P. 56(a) (summary judgment is appropriate

when "there is no genuine dispute as to any material fact and the movant is entitled to judgment

as a matter of law").

### C.     Count One

The City alleges in Count One of its First Amended Complaint that the Corporate

Defendants violated MCC § 2-25-090(a) by violating "any section of [the MCC] relating to

business operations or consumer protection" and "(a) marketing tobacco products and

accessories to Minors in Chicago and (b) failing to use an adequate age-verification system to

determine whether consumers were of legal age before selling tobacco products and accessories

to Chicago residents."  Doc. 17 ¶¶ 87–88.  The City only moves for summary judgment with

respect to its MCC § 2-25-090 claims on grounds that (1) the Corporate Defendants' violations

of MCC § 4-64-345 and 355 constitute violations of MCC § 2-25-090 and (2) the inadequacy of

---

[9]  For the same reasons discussed above, Defendants' protestations about entrapment and "innocently
violat[ing]" the MCC are unavailing.

the Corporate Defendants' age-verification system constitutes a separate violation of MCC § 2-25-090. Doc. 85 ¶ 5. Defendants object to this "piecemeal approach," citing "Local Rule 56-1(i)" for support.[10] Doc. 98 at 22. But this "piecemeal approach," *id.*, also known as a motion for partial summary judgment, "is commonly utilized where some of the non-movant's claims can be addressed as a matter of law." *Fid. Nat'l Title Ins. Co. v. Intercounty Nat'l Title Ins. Co.*, No. 00 C 5658, 2002 WL 1466806, at *12 (N.D. Ill. July 8, 2002). Accordingly, because the undisputed facts show that the City is entitled to summary judgment on Count One based on the Corporate Defendants' violation of other MCC provisions, the Court grants summary judgment to the City on this claim. *See Kiewit W. Co.*, 396 F. Supp. 2d at 921. However, because the Corporate Defendants' use of automatic age-verification systems cannot constitute an unfair business practice under the Illinois Consumer Fraud and Deceptive Business Practices Act (the "ICFA"), the Court denies the City's motion for summary judgment on this alternate theory of liability.

### 1.     Violations of MCC §§ 4-64-345 and 355

Section 2-25-090 makes any conduct "constituting a violation of . . . any section of this Code relating to business operations or consumer protection" a violation of the City's consumer fraud ordinance. The City claims, and Defendants agree, that violations of MCC §§ 4-64-345 and 355 are violations of sections of the MCC relating to business operations or consumer protection, and are parallel violations of § 2-25-090. Doc. 101 at 4 ("Equte does not dispute that

---

[10] This Local Rule does not exist. Defendants do not clarify in their reply whether they meant to cite to a different provision of the Local Rules, a different rule of civil procedure, or something else entirely. The Court's independent inquiry into the potential origins of "Local Rule 56-1(i)" was unavailing.

it . . . violated MCC §§ 4-64-345 and 4-64-355, and by extension MCC § 2-25-090(a)).  Thus, the Court grants the City's motion for summary judgment on Count One.[11]

### 2.    Defendants' Use of Automatic Age-Verification Systems

The City also moves for summary judgment on the basis that the Corporate Defendants' use of automatic age-verification systems constituted an "unfair business practice" that violated MCC § 2-25-090.  Doc. 86 at 6–12.  The City grounds its argument in the test that applies to unfairness cases brought under the ICFA.  *See id.* at 10; *see also* MCC § 2-25-090(a) ("In construing this section, consideration shall be given to court interpretations relating to the Illinois Consumer Fraud and Deceptive Business Practices Act, as amended.").  The City does not advance any other arguments that the use of the automatic age-verification system violated the ordinance; consequently, the Court limits its review to the ICFA factors.

The ICFA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practice . . . in the conduct of any trade or commerce."  815 Ill. Comp. Stat. 505/2.  The Illinois Supreme Court adopted the three relevant factors identified by the United States Supreme Court that determine whether a business practice is unfair under the ICFA: "(1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers."  *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 417–18 (2002) (citing *Fed. Trade Comm'n v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244 n.5 (1972)).  "Although the [test] seems to suggest that all three prongs . . . must be met," conduct "may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three.'"  *Id.* at 418 (quoting *Cheshire Mortg. Serv., Inc. v.*

---

[11] The City asserts multiple theories of liability in Count One of its First Amended Complaint.  Having determined that Defendants' conduct satisfies the primary theory of liability, the Court could reasonably end its analysis there and enter judgment for the City on Count One.  However, the Court goes on to address the City's additional theory of liability in this Opinion in the spirit of completeness.

*Montes*, 612 A.2d 1130, 1143–44 (Conn. 1992)). Courts evaluate whether conduct constitutes an "unfair practice" on a case-by-case basis. *See Scott v. Ass'n for Childbirth at Home, Int'l*, 88 Ill. 2d 279, 290 (1981); *see also Fitzgerald v. Chicago Title & Tr. Co.*, 72 Ill. 2d 179, 185–86 (1978); *Saunders v. Mich. Ave. Nat'l Bank*, 278 Ill. App. 3d 307, 313 (1996); *Elder v. Coronet Ins. Co.*, 201 Ill. App. 3d 733, 742 (1990).

Although a plaintiff must ordinarily show that the unfair practice caused them injury, that is not the case in enforcement actions where a government entity is enforcing its laws. *See* Doc. 51 at 6; *see also People ex rel. Madigan v. United Contr. of Am.*, 2012 IL App (1st) 120308, ¶¶ 6–15 (finding that no showing of actual damages is necessary when the Attorney General brings an action under the ICFA). Accordingly, because neither side disputes the facts and the parties only argue over the application of the legal test, the Court can properly decide the issue as a question of law. *See Ill. Cent. Gulf R.R. Co. v. Dep't of Local Gov't Affairs*, 95 Ill. 2d 111, 129 (1983) (when facts are settled outcome of case "depends solely upon an application of the appropriate legal standard to the undisputed facts").

### a. Whether the Use of the Age-Verification System Violated Public Policy

A business practice violates public policy if it "offends public policy as established by statutes, the common law or otherwise, or, in other words, whether it is at least within the penumbra of some established concept of unfairness." *Ekl v. Knecht*, 223 Ill. App. 3d 234, 242 (1991). "[I]n general the public policy of the State of Illinois is gleaned from its statutes, judicial decisions, constitution, and the practices of its government officials." *Kremers v. Coca-Cola Co.*, 712 F. Supp. 2d 759, 771 (S.D. Ill. 2010) (collecting cases interpreting the ICFA); *see also Sperry*, 405 U.S. at 244 n. 5 (a practice is unfair if it "offends public policy as it has been

established by statutes, the common law, or otherwise . . . is within at least the penumbra of some common-law, statutory, or other established concept of unfairness").

The City contends that "[p]reventing minors from using tobacco products has been an important public policy for decades, as evidenced by federal, state, and local laws prohibiting selling tobacco products to minors." Doc. 86 at 10. The City argues that the Court should evaluate whether the Corporate Defendants violated *its* public policy by allowing the sale of prohibited e-cigarette products to those younger than twenty-one, but older than eighteen, by improperly deploying automatic age-verification systems. Defendants argue that they tried to comply with every jurisdiction's age policy, but "the hodgepodge of laws governing underage tobacco sales was confusing at best and in actual conflict at worse." Doc. 101 at 7.

The City has misidentified the relevant business practice that the Court must analyze under the *Robinson* test. Although the sale of tobacco products, including e-cigarettes, is obviously a business practice under the ICFA, *see* 815 Ill. Comp. Stat. 505/1 (defining "trade" as including "the . . . sale, or distribution of . . . any property"), the City incorrectly argues that Illinois' and the nation's public policy against minors obtaining tobacco products tilts this prong of the *Robinson* test against the Corporate Defendants. The real business practice at issue is the Corporate Defendants' use of automatic age-verification systems that led to the illicit sales. *Cf. Kremers*, 712 F. Supp. 2d at 772 (analyzing use of high-fructose corn syrup in Coca-Cola because such use led to deceptive marketing claim). The Court thus examines whether this practice offended public policy.

The City's brief shows that the Corporate Defendants' use of automatic age-verification systems clearly did not offend public policy. The City notes that "in June 2019, Illinois passed legislation requiring online e-cigarette sellers to verify that purchasers are at least 21 years old

'through an independent, third party age verification service.'" Doc. 86 at 12 (quoting 720 Ill.
Comp. Stat. 675/1(a-5.1)(2)). The Corporate Defendants used such a service, although they did
so incorrectly, and for those missteps, the City is holding them liable in the instant lawsuit. It
would be a stretch to find that "public policy" prohibited the *misuse* of age-verification
services—indeed, to do so would transform every violation of any law governing business
conduct into an unfair business practice. Thus, because Illinois state law mandates the use of
automatic age-verification systems, the Court finds that the Corporate Defendants' use of such a
system did not violate public policy.

### b. The Other ICFA Factors

A business practice is "immoral, unethical, oppressive, or unscrupulous" under the ICFA
when it "leave[s] the consumer with little alternative except to submit to it." *Galvan v. Nw.
Mem'l Hosp.*, 382 Ill. App. 3d 259, 265 (2008) (citation omitted). For a practice to "cause[]
substantial injury to consumers," *Robinson*, 201 Ill. 2d at 418, the injury resulting from the
practice must "(1) be substantial; (2) not be outweighed by any countervailing benefits to
consumers or competition that the practice produces; and (3) be an injury that consumers
themselves could not reasonably have avoided." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 935 (7th
Cir. 2010) (citing *Montes*, 612 A.2d at 1147).

On the second prong, the City argues that the Corporate Defendants' faulty use of the
age-verification system was "immoral, unethical, and unscrupulous" because it allowed children
to gain access to products containing nicotine, which harms them. Doc. 86 at 11. For the third
prong, the City argues that tobacco products (and by extension, e-cigarettes) cause serious health
and safety risks, and that minors should be protected from such health impacts. *See id.* at 11–12.
The City does not connect either of these arguments to the applicable legal tests or cite any

caselaw in support. *See id.* Defendants do not separately address these prongs, but they do note that their "age-verification efforts fully complied with Illinois law" as it existed at the time, even if such compliance with the lower age restriction may have resulted in inadvertent violations of the MCC. Doc. 101 at 8.

The Court finds that the consumers accessing the Corporate Defendants' websites had "little alternative except to submit to [the age-verification systems]," *Galvan*, 382 Ill. App. 3d at 265 (citation omitted). There is no question that users of Equte's website, vapes.com, had to surmount several hurdles to purchase the Corporate Defendants' products, including entering their date of birth and location, and occasionally providing photos of their driver's licenses or other state identification cards. However, the Court believes that applying this prong of the test is nonsensical when the Corporate Defendants had a legal obligation to screen their customers to ensure that they did not sell their products to underage persons. The Corporate Defendants' use of age-verification software to restrict sales to those above the relevant age limit is as "unfair" a practice as it is for a gas station clerk to read a driver's license to ensure he does not sell cigarettes to a minor. Thus, this prong will not factor into the Court's conclusion.

The Court further finds that Corporate Defendants' use of the age-verification system did not cause "substantial injury" to consumers. *Siegel*, 612 F.3d at 937. Of course, the Court acknowledges the serious health risks that accompany underage use of tobacco and nicotine products. Defendants also recognized these risks, as evinced by Evenmo's desire that children would stay "far away from our business." Doc. 89 at 174:14–17. But even if Defendants' sale of e-cigarettes to minors caused substantial harm, and conceding that these sales did not create any benefits to competition or consumers, the City's claim fails on the third prong—whether the consumers *themselves* could have avoided the harm. *See Baston v. Live Nation Ent.*, 746 F.3d

27

827, 834 (7th Cir. 2014).  No one forced the individuals between the ages of eighteen to twenty-one responsible for the 600 sales to purchase e-cigarettes from the Corporate Defendants—although there are no facts in the record discussing the circumstances of the individual purchases, the Court must assume they were made voluntarily (to believe otherwise would be to engage in fantasy).  It was entirely within these consumers' power to *not* purchase e-cigarettes from the Corporate Defendants, meaning that they were capable of avoiding the harm.  *See id.* (no substantial injury where consumers were aware of parking fee and made purchase in spite of knowledge); *see also Siegel*, 612 F.3d at 937 ("And [plaintiff] cannot show that Defendants' conduct *caused* him to purchase their gasoline, because many factors contributed to [plaintiff]'s gasoline purchasing decision; his claim . . . is therefore undermined.").  Thus, the Court finds that the "substantial injury" prong of the *Robinson* test goes against a finding that the Corporate Defendants employed an unfair business practice.

Because the first and third factors of the *Robinson* test resolve in the Corporate Defendants' favor, and because the second prong does not apply to this case, the Court finds that the Corporate Defendants' use of the automatic age-verification systems did not constitute an unfair business practice under the ICFA.  The Court thus denies the City's motion for summary judgment on this basis.

In sum, the Court grants in part and denies in part the City's motion for summary judgment.  The Court grants summary judgment for the City on Counts One, Two, and Three of the First Amended Complaint and enters judgment for the City on all counts in the First Amended Complaint.  The Court, however, denies the City's motion with respect to its theory of liability in Count One regarding the Corporate Defendants' use of the automatic age-verification systems.

28

### III.     Defendants' Motion to Exclude Dr. Sherry Emery's Expert Report

The City retained Dr. Emery to opine on "electronic cigarette and vape products marketed to youth online and on social media, and use of such marketing by vapes.com and Juishy E-Liquids." Doc. 87-11 at 1. Defendants argue that Dr. Emery's report and testimony are "irrelevant to any material issue in this case." Doc. 98 at 23. The City argues that "Dr. Emery's testimony is [] highly relevant to the jury's determination whether Defendants' marketing practices constitute an 'unfair practice' in violation of MCC § 2-25-090." Doc. 121 at 21. The Court agrees with the City and denies Defendants' motion to exclude Dr. Emery's testimony.

Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), govern the admissibility of expert evidence. *See Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893 (7th Cir. 2011). Together, Rule 702 and Daubert provide that an expert's testimony is admissible if: (1) the expert is qualified, (2) the expert's methodology is reliable, and (3) the testimony is relevant, *i.e.*, it will help the trier of fact understand the evidence or determine a fact in issue. *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017); *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010). "*Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999). "The Rule 702 inquiry is 'a flexible one,'" and the Seventh Circuit grants "the district court wide latitude in performing its gate-keeping function." *Bielskis*, 663 F.3d at 894 (quoting *Daubert*, 509 U.S. at 594). The party seeking to admit the expert's testimony must show that it satisfies this test by a preponderance of the evidence. *Gopaltatnam*, 877 F.3d at 782. [12]

---

[12] Defendants do not challenge Dr. Emery's qualifications or the methodology she used to reach her conclusions.

Defendants argue that Dr. Emery's report is irrelevant because the City has "acknowledged that its claim for violation of MCC § 2-25-090(a) is limited to violations of MCC §§ 4-64-345 and 4-64-355, and Equte's alleged failure to implement adequate age verification procedures." *Id.* This appears to be a gross misreading of the City's claims. The City has never "acknowledged" any such thing: the code violations and additional theory regarding age verification procedures that Defendants cite are simply the grounds on which the City requests summary judgment, not the exclusive theories under which the City alleges Defendants violated MCC § 2-25-090. Indeed, the City's memorandum of law in support of its motion for summary judgment *explicitly* reserves for trial the question of whether the "Defendants violated MCC § 2-25-090 by marketing their e-cigarette products to underage users." Doc. 86 at 2 n.2. It is this question that Dr. Emery helps to answer through her report and testimony.

Focusing on the proper subject on which Dr. Emery opines, the Court finds that her report would help a jury decide whether the Corporate Defendants marketed their products to minors under the age of twenty-one. Indeed, Defendants implicitly concede this point. *See* Doc. 98 at 23 ("Yet the Emery report focused on Equte's alleged marketing and promotional strategies to youth and adolescents and the addictive nature of nicotine."). Dr. Emery's report describes the history of e-cigarette use and how companies like Juul leveraged social media to promote their products. *See* Doc. 87-11 at 3–5. The report discusses how e-cigarette companies "marketed aggressively on social media, using and adapting the very strategies the cigarette companies used to great effect to promote youth cigarette use." *Id.* at 5. Dr. Emery's report considers how these products and advertisements are geared specifically towards children, including the use of "flavors . . . featur[ing] foods and candies (Fruit Loops, cotton candy, etc.), cartoons (Sponge Bob) and themes . . . that directly appeal to the flavor and cultural palates of

30

adolescents."  *Id.* at 6.  Dr. Emery then discusses two of the Corporate Defendants' social media advertisements and opines that the Corporate Defendants' social media marketing is "especially potent with a youth audience."  *Id.* at 9; *see id.* at 8–11.  These discussions and opinions would assist a jury in determining whether the Corporate Defendants violated MCC § 2-25-090 through their marketing efforts.  *See Gopalratnam*, 877 F.3d at 779.

Although Defendants cite a passage of Dr. Emery's deposition testimony where she admits that she did not review any sales or age data, Doc. 98 at 23, Dr. Emery's testimony only relates to the Corporate Defendants' advertisements and use of social media, *see* Doc. 87-11 at 1. She did not need any information concerning the actual sales the Corporate Defendants made to opine on this topic.  To the extent that Defendants believe this undermines her conclusions or credibility, they may raise this point on cross-examination.  *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

Because Dr. Emery's report and testimony are relevant, the Court admits her as an expert witness under *Daubert* and Rule 702.

**CONCLUSION**

The Court grants in part and denies in part Defendants' amended motion for summary judgment [112], and denies their motion to exclude Dr. Sherry Emery's testimony [98].  The Court grants in part and denies in part the City's motion for summary judgment [85].  The Court enters judgment in favor of Defendant Evenmo and finds that he is not the alter ego of the Corporate Defendants.  The Court further finds that the Corporate Defendants' use of automatic age-verification systems did not violate MCC § 2-25-090.  The Court enters judgment for the

City on all Counts of the First Amended Complaint, specifically finding that Defendants' violations of MCC §§ 4-60-345 and 355 are separate violations of § 2-25-090 under Count One.

Dated: September 19, 2023

SARA L. ELLIS
United States District Judge